Raymond J. DONOVAN, Secretary of Labor, Petitioner/Cross-Respondent,

v.

RED STAR MARINE SERVICES, INC., Respondent/Cross-Petitioner.

Cal. Nos. 727, 728, Dockets 83-4158, 4168.

United States Court of Appeals, Second Circuit.

Argued Feb. 9, 1984.

Decided July 10, 1984.

James E. Culp, Atty. U.S. Dept. of Labor, Washington, D.C. (Francis X. Lilly, Deputy Sol. of Labor, Frank A. White, Associate Sol., for Occupational Safety and Health, Dennis K. Kade, Counsel for Appellate Litigation; Shelley D. Hayes, Atty., Washington, D.C., of counsel), for petitioner/cross-respondent.

James M. Kenny, New York City (McHugh, Leonard & O'Conor, New York City, of counsel), for respondent/cross-petitioner.

Before VAN GRAAFEILAND and TIMBERS, Circuit Judges, and RE, Chief Judge *.

* The Hon. Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

RE, Chief Judge:

By cross-petitions, both parties appeal from a final order of the Occupational Safety and Health Review Commission (Commission) which held that, although the Occupational Safety and Health Administration (OSHA) obtained a valid *ex parte* warrant, it did not have jurisdiction over the working conditions of "seamen" aboard an "uninspected vessel." In general terms, this case presents a jurisdictional conflict between two federal agencies, OSHA and the Coast Guard.

The two questions presented are: (1) whether OSHA has jurisdiction over the "working conditions" of employees aboard uninspected vessels [1] operating on navigable waters, or whether the Coast Guard, a sister federal agency, had "actually exercised" its authority over the working conditions of employees aboard uninspected vessels operating on navigable waters; and (2) whether the *ex parte* warrants obtained by OSHA in this case were valid.

Since we hold that OSHA has jurisdiction over the working conditions of employees aboard uninspected vessels, and that the *ex parte* warrants were valid, we remand the case for further proceedings consistent with this opinion.

## The Facts

Red Star Marine Services, Inc. (Red Star) operates a tugboat and marine towing service along the eastern seaboard of the United States. Its fleet includes the tugboat "STAMFORD," which was inspected by an OSHA Compliance Officer on the 27th and 29th of May, 1980. The inspection, prompted by an employee complaint, was conducted pursuant to an *ex parte* warrant issued by a United States Magistrate after Red Star had refused the Compliance Officer's request to inspect the tugboat for safety and health violations. As a result of that inspection, the Secretary of Labor, the stat- utory head of OSHA, cited Red Star with violations of the Occupational Safety and Health Act of 1970, 84 Stat. 1590, 29 U.S.C. § 651 *et seq.*, (1982) (OSH Act). In particular, the Secretary alleged violation of 29 C.F.R. § 1910.95, in that, Red Star had failed to provide protection against excessive noise levels, and had failed to administer a continuing hearing conservation program.

## The Administrative Proceedings

Red Star contested the Secretary's allegations and pursued the available administrative remedies. Subsequent to the first hearing, in a decision dated July 13, 1982, the OSHA Administrative Law Judge (ALJ) upheld the Secretary's actions, and rejected Red Star's contentions that OSHA lacked jurisdiction, and that the warrants were invalid. Red Star petitioned the Commission for discretionary review. On review, the Commission upheld the validity of the warrants, and remanded, for reconsideration by the ALJ, the question of jurisdiction in light of *Dillingham Tug & Barge Corp.*, ___ OSAHRC ___, 10 O.S.H.Cas. (BNA) 1859, 1982 O.S.H.Dec. (CCH) ¶ 26,-166 (1982). In *Dillingham*, the Commission found that "the Coast Guard has prescribed, and it enforces, regulations that govern the working conditions of seamen aboard both inspected and uninspected vessels operating on navigable waters." *Id.* at ___, 10 O.S.H.Cas. (BNA) at 1861, 1982 O.S.H.Dec. (CCH) at 32,996. Hence, since "section 4(b)(1) precludes the Secretary from enforcing the OSH Act with respect to [the] working conditions" of "seamen" aboard vessels operating on the navigable waters, the Commission held that the Coast Guard had exclusive jurisdiction. *Id.* at ___, 10 O.S.H.Cas. (BNA) at 1860, 1982 O.S.H.Dec. (CCH) at 32,995.

Pursuant to the remand order, a second hearing, which consisted largely of the testimony of a Coast Guard officer, was held

---

1. Chapter I of 46 Code of Federal Regulations and the recent amendments to Title 46, United States Code, enacted by Pub.L. 98–89, 97 Stat. 500 (1983), classify vessels according to factors such as weight, purpose, and method of propulsion. One type of vessel classified pursuant to Title 46 is an "uninspected vessel," which is a term used to denote that it is not subject to the Coast Guard's Inspection and Certification authority. 46 U.S.C. § 2101(43).

on February 9, 1983. Based upon that testimony, the regulations found in 46 C.F.R., Chapter I, and the Commission's decision in *Dillingham*, the ALJ reversed his prior decision, and held that since the Coast Guard had jurisdiction, OSHA could not enforce its regulations in this case. Since the Commission did not act upon the Secretary's petition for discretionary review of the decision on remand, on June 23, 1983, by operation of section 12(j) of the OSH Act, 29 U.S.C. § 661(i), the ALJ's decision became a final order of the Commission.

Pursuant to sections 11(a) & (b) of the OSH Act, 29 U.S.C. §§ 660(a) & (b) (1982), the Secretary seeks judicial review of the determination that OSHA does not have jurisdiction over the working conditions of "seamen" aboard uninspected vessels. Red Star, by cross-petition, seeks review of that part of the Commission decision which upheld the validity of the *ex parte* warrant.

## Standard of Review

The OSH Act applies to all employment performed in workplaces located within the several states; the District of Columbia; Puerto Rico; the Virgin Islands; Samoa, Guam, Wake and Johnston Islands; the Trust Territory of the Pacific Islands; and on the Outer Continental Shelf lands. Section 4(a), 29 U.S.C. § 653(a). Unless engaged in the field of nuclear or atomic energy, a private employer is not exempt from the OSH Act. The only exception is when a sister federal agency is vested with the statutory authority to prescribe or regulate occupational safety or health matters within its purview. Section 4(b)(1), 29 U.S.C. § 653(b)(1).

In this case, the Commission vacated OSHA's citation of the STAMFORD for noncompliance with its occupational noise regulation, on the ground that the Coast Guard comprehensively regulates the working conditions of employees aboard uninspected vessels on navigable waters. In *Marshall v. Northwest Orient Airlines, Inc.*, 574 F.2d 119 (2d Cir.1978), this Court considered the question of the exemption pursuant to section 4(b)(1), and held that it is a mixed question of "law and fact." *Id.* at 122.

The applicable standard of review for questions of fact is specified in section 11(a) of the OSH Act, 29 U.S.C. § 660(a), which provides that the findings of the Commission "if supported by substantial evidence on the record considered as a whole, shall be conclusive." *Id.* As to questions of law, however, the court is free to determine whether the Commission's legal conclusion is "in accordance with law." 5 U.S.C. § 706(2)(a). It is, of course, the function of the court to ascertain the meaning of the pertinent legislation, and to give effect to the legislative purpose. Nevertheless, judicial authority teaches that, even in cases of statutory interpretation and application, appropriate weight must be given to the interpretation of a statute by the agency charged with its administration. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965). *Accord Tyson v. Maher*, 523 F.2d 972, 974 (2d Cir.1975). This standard has been followed by other circuits in an occupational health and safety context. *See Dunlop v. Rockwell International*, 540 F.2d 1283, 1289–90 (6th Cir.1976) (deferring to the Commission's construction of the Act despite the Secretary's contrary view). *Accord GAF Corp. v. OSHRC*, 561 F.2d 913, 915 (D.C.Cir.1977) (deferring to administrative interpretation of OSHA regulations when the Secretary and the Commission agreed).

## Jurisdiction

The first question presented requires the interpretation of section 4(b)(1) of the OSH Act, 29 U.S.C. § 653(b)(1) (1982). This section provides that:

Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies, and State agencies acting under section 2021 of Title 42, exercise statutory authority to prescribe or enforce standards

or regulations affecting occupational safety or health.

*Id.*

The Commission agrees that a correct interpretation of section 4(b)(1) requires an actual exercise of delegated statutory authority. We differ with the Commission, however, on the issue of whether the Coast Guard has actually exercised the authority conferred. Thus, the question presented does not involve an ordinary question of fact, but rather, the interpretation and application of the statutes and regulations applicable to the authority and responsibilities of the Coast Guard.

It is undisputed by the parties that the Coast Guard possesses extensive statutory authority, and is the agency primarily responsible for maritime safety. Section 2 of Title 14 provides that the Coast Guard "shall administer laws and promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States covering all matters not specifically delegated by law to some other executive department ...." *Id.* Numerous sections of Title 46 of the United States Code also grant specific authority to the Coast Guard. *See, e.g.,* 46 U.S.C. §§ 3301–18 (governing inspection of vessels). The proposition that Congress intended the Coast Guard to be primarily responsible in the area of maritime safety is supported by the legislative history of the recent amendments to Title 46. H.R. Rep. No. 338, 98th Cong., 1st Sess., *reprinted in* 1983 U.S.Code Cong. & Ad. News 924.

It is equally clear, however, and also undisputed by the parties, that the Coast Guard does not exercise and has not exercised any statutory authority to regulate noise hazards aboard uninspected vessels such as the STAMFORD. In fact, the Coast Guard has historically viewed its authority to regulate uninspected vessels as limited to the regulation of life-saving and fire fighting equipment, backfire flame control, ventilation, the reporting of casualties and the licensing of operators. In the past, the Coast Guard had made several attempts to obtain additional grants of authority from Congress in order to regulate more comprehensively the uninspected fleet. *See, e.g.,* Marine Safety Program: Hearings on H.R. 3486 before the Subcomm. on Coast Guard and Navigation of the House Comm. on Merchant Marine and Fisheries, 98th Cong., 1st Sess. 466–68 (1983) (statement of Admiral James S. Gracey, Commandant, U.S. Coast Guard). Indeed, in his testimony before the House Subcommittee on Coast Guard and Navigation, Admiral Gracey, Commandant of the Coast Guard, specifically requested additional authority over uninspected vessels: "We ... need some statutory authority [to regulate uninspected vessels]. We don't have that now." *Id.* at 467. Congressional inaction on this suggestion, most notably the failure to provide additional authority to regulate towing vessels, clearly evidences an unwillingness to expand the Coast Guard's authority over the uninspected fleet. Hence, it cannot be questioned that there is a significant distinction between "uninspected" vessels and "inspected and certificated" vessels, in that the regulations affecting "inspected and certificated" vessels are more numerous, extensive, and pervasive than those affecting "uninspected" vessels.

Notwithstanding an exhaustive search, we have been unable to discover any provision in the United States Code, or the Code of Federal Regulations which addresses the Coast Guard's authority to regulate noise hazards aboard uninspected vessels. We do, however, take judicial notice of the fact that the Coast Guard has issued *recommendations* on the control of excessive noise in *Navigation and Vessel Inspection Circular* 12–82, dated June 2, 1982. It is important to note that this circular was promulgated after the events which led to this litigation, and, by its terms, was directed toward inspected and not uninspected vessels.

Thus, we are faced with the question whether, under section 4(b) of the OSH Act, the regulatory authority of the Coast

Guard in maritime matters preempts OSHA's statutory authority to regulate a hazard aboard a vessel not addressed by the Coast Guard.

Although not in issue, the Secretary concedes that the pervasive regulations by the Coast Guard of safety and health matters aboard *inspected* vessels eliminates or excludes OSHA's jurisdiction over those vessels.[2] The Secretary, however, maintains that the Coast Guard has not "comprehensively exercised," within the meaning of section 4(b), statutory authority as to the working conditions, particularly noise hazards, of "seamen" aboard uninspected vessels. The Secretary contends that comprehensive regulation is required to justify an industry-wide exemption from OSHA regulation. On the other hand, Red Star contends that the Coast Guard has exercised jurisdiction over some matters affecting the health and safety of its "seamen" aboard the STAMFORD, an uninspected vessel, and that preemption may occur even though the Coast Guard has chosen to regulate less stringently than OSHA.

Were this to be a case of first impression, it would seem clear that noise is a "working condition" within the plain meaning of section 4(b)(1), and that the Coast Guard has not "exercised" statutory authority over noise aboard uninspected vessels. It would follow, therefore, that the OSHA regulations would apply. Similar issues, however, have been presented to a number of circuit and district courts which have not interpreted section 4(b)(1) consistently.

In *Marshall v. Northwest Orient Airlines, Inc., supra,* this Court held that section 4(b)(1) was not intended "to eliminate OSHA's jurisdiction merely on the basis of hypothetical conflicts," nor "designed to provide wholesale exceptions for entire industries." *Id.* at 122. Accordingly, this Court held that "a sister agency must actu-

ally be *exercising* a power to regulate safety conditions in order to preempt OSHA." *Id.* (emphasis in original).

Other circuits have agreed with the interpretation that the term "exercise," as used in section 4(b)(1) of the Act, requires an actual, concrete assertion of regulatory authority as opposed to a mere possession of authority. Furthermore, the decisions teach that section 4(b)(1) was not intended to create industry-wide exemptions based on isolated or narrow exercises of statutory authority. In *Southern Ry. Co. v. OSHCR,* 539 F.2d 335 (4th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976), the Fourth Circuit demonstrated that this view of section 4(b)(1) was indeed the intent of Congress. *Id.* at 336–37. *See also Southern Pacific Transp. Co. v. Usery,* 539 F.2d 386, 390 (5th Cir.1976), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977); *Baltimore & Ohio R.R. Co. v. OSHRC,* 548 F.2d 1052, 1054 (D.C.Cir.1976). We agree that the term "exercise," as used in section 4(b)(1) of the Act, requires more than isolated regulations peripherally affecting the working condition of employees.

Red Star cites authority for the proposition that, because of pervasive regulation by the Coast Guard of working conditions on board vessels in navigation, there is, for "seamen," an industry-wide exemption from OSHA regulation. We reject this contention. First, the authorities relied upon are distinguishable, and, furthermore, most of the opinions cited did not address the considerable variation in the pervasiveness of Coast Guard regulation between inspected and uninspected vessels.

In *Donovan v. Texaco, Inc.,* 720 F.2d 825 (5th Cir.1983), the question was whether section 11(c) of the OSH Act could be enforced as to "seamen." Although the Fifth Circuit deferred to the Commission's opin-

2. In accordance with a "Memorandum of Understanding" signed by the Commandant of the Coast Guard and the Assistant Secretary for Occupational Safety and Health, Department of Labor, the Secretary has taken the position, that "the Coast Guard has issued comprehensive standards and regulations concerning the working conditions of seamen aboard *inspected* vessels," and that OSHA may not enforce its regulations with respect to "seamen" aboard *inspected* vessels.

ion in *Dillingham,* which held that OSHA lacked jurisdiction over the working conditions of "seamen" aboard uninspected vessels, it also found an actual conflict with the Coast Guard's scheme of regulation. The court held that "the parallel but divergent protective plan of 11(c) would be precisely the sort of duplication [by sister federal agencies] that the Congress meant to forbid by enacting Section 4(b)(1) of OSHA." *Id.* at 829.

The *Texaco* opinion was based in part on an earlier Fifth Circuit opinion, *Clary v. Ocean Drilling & Exploration Co.,* 609 F.2d 1120 (5th Cir.1980), which not only deferred to Commission precedent, but also based its decision on a ground independent of section 4(b)(1). *Clary* involved a Jones Act suit in which the plaintiff alleged he was injured as a result of several violations of OSHA regulations. These violations, he argued, constituted negligence *per se.* The court examined those regulations and concluded that they were intended to cover only certain specific situations, and did not apply to the situation which occasioned the plaintiff's injury. *Id.* at 1122.

In support of its position, Red Star also refers to the following language quoted from *Taylor v. Moore-McCormack Lines, Inc.,* 621 F.2d 88 (4th Cir.1980):

> The Coast Guard has responsibility for the safety of "seamen" under the regulations issued by it, whereas the Department of Labor, under OSHA, has statutory responsibility for the safety of longshoremen at work under regulations issued by it. The respective responsibilities, thus established, are exclusive. This exclusivity is expressly declared in connection with longshoring; it is implicit so far as seamen are concerned.

*Id.* at 93. In *Taylor,* the question was whether certain Coast Guard regulations applied to "longshoremen," not whether OSHA regulations applied to "seamen" aboard uninspected vessels. Again, the court did not consider the void or *lacunae* which existed by virtue of the lack of pervasive Coast Guard regulation of working conditions of employees aboard uninspected vessels. Hence, *Taylor* cannot be said to have precedential authority.

 Finally, Red Star relies on the following quotation from *Barger v. Mayor & City Council of Baltimore,* 616 F.2d 730 (4th Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 105, 66 L.Ed.2d 39 (1980): "In 29 C.F.R. § 1910.5(b), the Labor Department placed outside the reach of the regulations employees whose occupational safety and health are within the statutory jurisdiction of other federal agencies. The Coast Guard is empowered to lay down health and safety rules for Jones Act seamen ...." *Id.* at 732. It is clear that 29 C.F.R. § 1910.5(b) is simply a restatement of section 4(b)(1) of the OSH Act. It does not in any way alter our view that mere possession of statutory authority is insufficient to preempt OSHA, and that section 4(b)(1) requires an actual, concrete exercise of that authority. We, therefore, hold that noise aboard an uninspected vessel is a working condition which is not regulated by the Coast Guard.

We realize that our holding is contrary to the opinion expressed by the Commission in *Dillingham.* In precluding OSHA jurisdiction in *Dillingham,* the Commission rejected the distinction between inspected and uninspected vessels, and justified its view on the basis of the few Coast Guard regulations that applied to uninspected vessels.

In our view, isolated Coast Guard regulations, such as the load line statute, 46 U.S.C. § 88, do not constitute an *exercise* of statutory authority by the Coast Guard, within the meaning of section 4(b)(1), sufficient to oust OSHA of jurisdiction to regulate working conditions for employees aboard uninspected vessels.

While the regulations cited by the Commission in *Dillingham* are safety regulations which pertain to the "seaworthiness" of vessels and the safety of those aboard, they only incidentally regulate the working conditions of employees. Examples of safety regulations only incidental to the regulation of working conditions are: regulations on the use of petroleum gas, 46 C.F.R. § 25.45–1; ventilation requirements,

46 C.F.R. § 25.40–1; backfire flame control, 46 C.F.R. § 25.35–1; and fire extinguishers, 46 C.F.R. § 25.30. Other regulations merely govern qualifications for a particular employment, for example, the manning requirements found in 46 C.F.R. § 157, and not the working conditions of that employment.

It would do violence to the clear intent of Congress to hold that these instances of Coast Guard regulation of working conditions aboard uninspected vessels would serve to deny an entire class of employees the protection of major safety legislation such as the OSH Act. There can be no doubt that it was the intent of Congress "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions...." 29 U.S.C. § 651(b). *Accord Marshall v. Western Electric, Inc.*, 565 F.2d 240, 245 (2d Cir.1977). It is also beyond question that section 4(b)(1) of the OSH Act should be interpreted and applied "to achieve the maximum protection for the industrial workers of the Nation." *Southern Ry. Co.*, 539 F.2d at 338. As recognized by the Supreme Court of the United States, Congress has historically been especially protective of "seamen":

> [W]orkers at sea have been the beneficiaries of extraordinary legislative solicitude, undoubtedly prompted by the limits upon their ability to help themselves. The statutes of the United States contain elaborate requirements with respect to such matters as their medicines, clothing, heat, hours and watches, wages and return transportation to this country if destitute abroad.

*Southern Steamship Co. v. NLRB*, 316 U.S. 31, 39, 62 S.Ct. 886, 890, 86 L.Ed. 1246 (1942) (citation omitted). That this solicitude is longstanding may be noted from many of the provisions of Title 46, Subtitle II, Part G, 46 U.S.C. §§ 10101–11507 (Supp. 1983), entitled "Merchant Seamen Protection and Relief," which date back well over a century.

To agree with the views expressed by Red Star would result in this Court mandating the *status quo*. As a practical matter, this would mean that neither OSHA nor the Coast Guard would exercise authority over the uninspected vessel fleet, to the detriment of those employees exposed to the hazard of excessive noise.

In light of the extensive tradition of congressional concern for mariners, Congress could not have intended that employees aboard uninspected vessels be deprived of the protections accorded the vast majority of American workers by the OSH Act, and those protections offered employees aboard inspected and certificated vessels. It is clear that the Coast Guard's regulation of uninspected vessels is limited to only a few areas. Consequently, it cannot be said that it is exercising jurisdiction sufficient to regulate comprehensively the working conditions of employees aboard uninspected vessels.

Since the Coast Guard is not exercising statutory authority within the meaning of section 4(b)(1) of the OSH Act, we hold that OSHA possesses statutory authority to regulate the working conditions of employees aboard uninspected vessels. Hence, OSHA may regulate noise hazards aboard uninspected vessels.

### *Ex Parte Warrant*

The second question presented requires that we determine whether the Secretary was empowered to obtain the *ex parte* warrant which authorized the OSHA Compliance Officer to inspect the STAMFORD. The Secretary contends that the version of regulation 1903.4, which was in effect at the time the STAMFORD was inspected, authorized OSHA to obtain *ex parte* warrants. Red Star's assertion that the Secretary was not authorized necessitates an examination of the history of this regulation.

To effectuate the strong congressional policy that every person employed in the United States be afforded a safe working environment, the Secretary of Labor, as statutory head of OSHA, was expressly granted the authority to enter and inspect workplaces for occupational hazards "dur-

ing regular working hours and at other reasonable times ...." Section 8(a), 29 U.S.C. § 657(a). Section 8(g)(2), 29 U.S.C. § 657(g)(2), of the OSH Act also authorizes the Secretary to promulgate rules and regulations necessary to implement this statutory authority.

In 1971, proposed regulation 1903.11, predecessor of regulation 1903.4, was promulgated pursuant to section 8(g). Pursuant to the regulation, a compliance officer was to report the employer's denial of voluntary access to the Area Director, who was to consult with both the Regional Administrator and the Regional Solicitor for the purpose of "promptly seek[ing] appropriate compulsory process." 36 Fed.Reg. 8,376, 8,378 (May 5, 1971). The proposed regulation was subsequently renumbered and adopted, containing a minor alteration which directed the compliance officer to "take appropriate action, including compulsory process, if necessary." *Id.* at 17,851 (Sept. 4, 1971) (current version at 29 C.F.R. § 1903.4 (1983)).

Subsequent to the adoption of regulation 1903.4, OSHA issued a series of Compliance and Field Operations Manuals. These manuals, which provide guidance to OSHA compliance officers in enforcing the OSH Act, contained explicit provisions to the effect that inspection warrants would be obtained in appropriate circumstances without advance warning to the affected employer. For example, 2(i) of the original 1972 version of the manual stated that: "[e]xcept in unusual circumstances ...., there shall be no advance warning to the employer of the fact either that a warrant has been secured or that inspection will take place pursuant to the warrant." In 1976, the manual was amended and excluded 2(f), which dealt with situations where a compliance officer did not have to obtain permission to inspect, but, retained 2(i) with one modification, the term "compulsory process" was substituted for that of "warrant."

In *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the issue before the Supreme Court was

the constitutionality of OSHA's practice of nonconsensual warrantless inspections made pursuant to regulation 1903.4. The Court held that, although no search warrant or other process is expressly required by the OSH Act, OSHA's practice of compelling compliance by nonconsensual warrantless inspections violated the Fourth Amendment. *Id.* at 324, 98 S.Ct. at 1826.

Since the present case deals with an inspection pursuant to an *ex parte* warrant issued by a United States magistrate, and not a nonconsensual warrantless inspection held unconstitutional in *Barlow's*, an extended discussion of the validity of warrantless inspections is not required. *See Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and *See v. Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

However, in *Barlow's* the Supreme Court, in commenting on the alternatives to nonconsensual warrantless inspections, appeared to interpret the words "compulsory process," as contained in 29 C.F.R. § 1903.4 (1977), as not including *ex parte* warrants. *See* 436 U.S. at 318, 98 S.Ct. at 1823. These comments by the Supreme Court, pertaining to whether compulsory process includes *ex parte* warrants, are generally conceded by federal courts to be *dicta*. Nevertheless, in *Cerro Metal Products v. Marshall*, 467 F.Supp. 869 (E.D.Pa. 1979), *aff'd*, 620 F.2d 964 (3d Cir.1980), the district court found that the Supreme Court's comments in *Barlow's* properly interpreted regulation 1903.4, and held that the Secretary was not empowered to seek *ex parte* warrants. *Id.* at 872. On December 22, 1978, in response to a preliminary injunction issued in the *Cerro Metal* case, and while the *Cerro Metal* proceedings were still pending, the Secretary published a regulation which amended 29 C.F.R. § 1903.4. *See* 43 Fed.Reg. 59,838 (Dec. 22, 1978). The regulation which amended 29 C.F.R. § 1903.4 expressly provided that "compulsory process" included the seeking of *ex parte* warrants. 29 C.F.R. § 1903.-4(d). The Secretary published this regulation without meeting the notice and com-

ment provisions of the Federal Administrative Procedure Act, 5 U.S.C. § 553, pursuant to the exemption for "interpretative rules and statements of policy." *Id.* (d)(2).

In *Cerro Metal,* however, District Judge Pollak ruled that since the amendment of December 22, 1978 would "substantially affect[ ] the rights of those over whom the agency exercises authority," it was actually a substantive regulation, and, therefore, was invalidly promulgated. *Id.* at 879–80 (quoting *Pickus v. United States Board of Parole,* 507 F.2d 1107, 1114 (D.C.Cir.1974)). A panel of the Court of Appeals for the Third Circuit, with Chief Judge Seitz dissenting, affirmed. The majority opinion stated that the district court correctly distinguished between interpretative and legislative rules, and found that the regulation in question was a legislative rule "masquerading" as an interpretative rule. 620 F.2d at 981. This view was followed by the Fifth Circuit in *Donovan v. Huffines Steel Co.,* 645 F.2d 288, 289 (5th Cir.1981), *aff'g mem. Marshall v. Huffhines Steel Co.,* 488 F.Supp. 995 (N.D.Tex.1979), and *Smith Steel Casting Co. v. Donovan,* 725 F.2d 1032, 1034 (5th Cir.1984). Red Star cites these cases and contends that they express the correct view.

The Secretary, on the other hand, contends that regulation 1903.4 was always intended to include authority to seek *ex parte* warrants; that the Supreme Court's comments in *Barlow's* were non-binding *dicta;* and that, in the alternative, the December 22, 1978 regulation effectively clarified the confusion caused by the Supreme Court's *dicta* in *Barlow's.*

■ Upon careful review of this important question, we are persuaded by the contentions of OSHA, and disagree with Red Star on several grounds. Furthermore, we feel that both the majority opinion of the Court of Appeals and the District Court in *Cerro Metal* misinterpreted the Supreme Court's discussion of regulation 1903.4 in *Barlow's.* In *Barlow's,* the Supreme Court only held that OSHA's practice of nonconsensual warrantless inspections violated the Fourth Amendment. It

did not hold that OSHA did not have the statutory authority to seek *ex parte* warrants. Indeed, in footnote 15 of the *Barlow's* opinion, the Court stated: "Insofar as the Secretary's statutory authority is concerned, a regulation expressly providing that the Secretary could proceed *ex parte* to seek a warrant or its equivalent would appear to be as much within the Secretary's power as the regulation currently in force and calling for 'compulsory process.'" *Id.* 436 U.S. at 320 n. 15, 98 S.Ct. at 1824 n. 15. Furthermore, in discussing the alleged threat that obtaining warrants would pose upon the efficient administration of OSHA, the Supreme Court stated that "the Secretary should never have adopted [regulation 1903.4], particularly when the Act does not require it." *Id.* at 319, 98 S.Ct. at 1824. The confusion stems from the Court's interpretation of the words "compulsory process" as not including *ex parte* warrants. Clearly, these comments were non-binding *dicta,* and we disagree with the view that it was integral to the Supreme Court's holding. *See Cerro Metal,* 467 F.Supp. at 876. While we, of course, agree that the *dicta* of the nation's highest Court merits the greatest deference, we also heed the admonition of Chief Justice Marshall that:

> general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. . . .

*Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821), *quoted in,* Re, *Stare Decisis,* 79 F.R.D. 509, 512 (1978). Accordingly, we respectfully decline to follow the Supreme Court *dicta* since upon plenary consideration, a different result is warranted.

We agree with the view expressed by Chief Judge Seitz in his dissent in *Cerro Metal* that "the phrase 'compulsory process' in § 1903.4 is certainly broad enough to encompass ex parte warrants [and that,] the ordinary meaning of that ·phrase in-

cludes ex parte warrants." 620 F.2d at 983 (Seitz, C.J., dissenting). We also agree that dropping 2(f) from the 1976 manual only meant that a compliance officer must first seek the owner's permission before inspecting the premises. It did not mean that the use of *ex parte* warrants was not contemplated by the 1976 manual. This is supported by the retention of 2(i) in subparagraph (8), pertaining to the element of surprise, which represented a fall-back position in case warrants were required. Indeed, as stated by Chief Judge Seitz, the Supreme Court's *dicta* in *Barlow's* when "[v]iewed in light of [OSHA's] litigation strategy ... makes sense." *Id.* at 984.

Other circuits which have faced this problem have held that OSHA had the authority to seek *ex parte* warrants, but indicate that the 1978 amendment was necessary for the Secretary to continue to seek them. For example, in *Rockford Drop Forge Co. v. Donovan*, 672 F.2d 626 (7th Cir.1982), Rockford challenged OSHA's *ex parte* inspection of its premises, claiming that it had no power to obtain an *ex parte* warrant since the 1978 amendment was invalid due to noncompliance with section 4(b) of the Administrative Procedure Act. In holding both the warrant and the amendment valid, the court stated that the Secretary "took advantage of the Supreme Court's suggestion" when it promulgated the 1978 amendment, and that the 1978 amendment was "approved in advance" by the Supreme Court. *Id.* at 630. Similarly, the Tenth Circuit in *Marshall v. W & W Steel, Inc.*, 604 F.2d 1322 (10th Cir.1979), held that since the 1978 amendment was an interpretative rule, OSHA had the authority to obtain an *ex parte* warrant in that case. *Id.* at 1325–26.

Although we are of the opinion that it was not necessary for the Secretary to amend regulation 1903.4 in order to seek *ex parte* warrants, we do believe that the Secretary's 1978 action is indicative of the position that he has taken consistently and merits discussion. While it is unfortunate that Congress has provided little guidance in distinguishing interpretative from substantive rules, the case law in this circuit

looks to whether a rule "changed existing rights and obligations." *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 482 (2d Cir.1972); *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975); *Viacom Int'l Inc. v. FCC*, 672 F.2d 1034, 1042 (2d Cir.1982). Only rules that do not change "existing rights and obligations" are considered interpretative.

In our view, at the time the 1978 amendment was published, the Secretary was authorized by statute and regulation to seek the *ex parte* warrants, and the sole effect of the 1978 amendment was to dispel the uncertainty caused by the *dicta* in *Barlow's*. The 1978 amendment was therefore nothing more than what it purported to be, an interpretative rule and statement of policy which had no substantive effect on the Secretary's administrative authority and responsibility under the statute. Nor did it alter the rights and duties of any person affected by the OSH Act. This view was expressed by the Ninth Circuit in *Stoddard Lumber Co., Inc. v. Marshall*, 627 F.2d 984, 990 (9th Cir.1980), and by the Western District of Virginia, which held that the Secretary had always maintained the position that "compulsory process" included *ex parte* warrants. *Matter of Establishment Inspection of Seaward Int'l. Inc.*, 510 F.Supp. 314, 317 (W.D.Va.1980), *aff'd mem. sub nom Marshall v. Seaward Int'l Inc.*, 644 F.2d 880 (4th Cir.1981).

It is manifest that the Secretary, despite the perhaps infelicitous rewording of the manuals, had no intention to relinquish or renounce the authority to seek *ex parte* warrants. These changes were made simply to accommodate the procedure of compelling nonconsensual warrantless inspections, found unconstitutional in *Barlow's*, by replacing "warrant" with the broader and more inclusive words, "compulsory process." Thus, we find that, "compulsory process," as used by the Secretary in the regulation and in subsequent revisions of the manual, was always intended to encompass both the seeking of *ex parte* warrants, and actions to compel compliance with the

nonconsensual warrantless inspections declared unconstitutional in *Barlow's*.

Hence, we hold that pursuant to its statutory authority and regulations, OSHA was authorized to seek *ex parte* inspection warrants at the time the STAMFORD was inspected, and that the *ex parte* inspection warrants obtained by OSHA in this case were valid.

### Conclusion

In view of the foregoing, it is the holding of the court that noise is a "working condition," and, since the Coast Guard is not exercising jurisdiction over the working conditions of employees aboard uninspected vessels operating on navigable waters, OSHA may exercise its jurisdiction. Therefore, that part of the order on appeal which states that OSHA does not have jurisdiction, is REVERSED.

Since we also hold that the *ex parte* warrants obtained by OSHA in this case were valid, that part of the order on appeal which states that the warrants were valid, is AFFIRMED.

The case is REMANDED for further proceedings consistent with this opinion.